## JAMES BALLARD v. STATE.

No. A-2171.   Opinion Filed February 19, 1916.

(154 Pac. 1197.)

1.  HOMICIDE—Degrees—Instructions—Evidence.   While the jury has the right to determine the degree of crime committed in a homicide case, it is for the court to determine what degrees of homicide the evidence tends to establish, and it is the duty of the court to confine its charge to such degrees.

2.  HOMICIDE—Manslaughter in Second Degree.   Where the killing with a deadly weapon is admitted, and there is no pretense that the killing was accidental, and where the defense is justifiable homicide in self-defense, there can be no issue of manslaughter in the second degree.

3.  REVIEW—Presentation Below—Instructions.   A defendant who has been convicted of manslaughter in the second degree cannot complain that the court charged the law of manslaughter in the second degree, and that the evidence did not justify such a charge, where the record shows no objection was made or exception taken to this part of the charge in the court below.

*Appeal from District Court, Grady County;*
*Frank M. Bailey, Judge.*

James Ballard, convicted of manslaughter in the second degree, appeals.   Affirmed.

*Bond, Melton & Melton,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   The plaintiff in error, herein referred to as the defendant, was convicted of the crime of manslaughter in the second degree, and in accordance with the verdict of the jury was sentenced to imprisonment in the county jail of Grady county for the period of twelve months.

The information charged that the defendant, James Ballard, did in Grady county, on or about the 5th day of July, 1913, kill and murder Arthur Goodnight, by shooting him with a shot gun.

From the judgment and sentence he appeals to this court:

The evidence shows that the deceased, Arthur Goodnight, was a brother-in-law of the defendant James Ballard, having married his sister. The defendant lived with his parents on a farm near Dutton P. O., in Grady county, and the deceased with his wife and three children lived in the same neighborhood. On the third of July, the deceased with his wife and children visited her parents, and stayed there that night. The next day the deceased assisted his father-in-law to save some alfalfa hay. When the deceased came to the house that evening, there was some family trouble. The evidence offered by the defendant was to the effect that the deceased became angry because the women folks did not save some of the Fourth of July ice cream and cake for him. However, the deceased left his wife there and returned home. On the next day, during the forenoon, the deceased returned in a buggy to his father-in-law's place, and took away his three-year-old daughter. No trouble occurred at that time. About mid-day, he passed by the house again, accompanied by his little girl. After passing the house the wife of the deceased waved to him and he stopped down the road from the house a distance of more than one hundred yards, saying to his wife that she would have to come down there if she wanted to talk to him. The wife of the deceased with her baby in her arms started to the place where he had stopped on the section line road. The defendant went to the house and reached behind the door and got his shot gun, saying to his sister that if she was going he would go along and protect her. They went on inside of the fence and when they reached the point where the deceased had stopped, the defendant stepped on the wire so his sister could cross. About this time the deceased got out of the buggy and started towards the fence, then started back to the buggy.

According to the defendant's statements before the trial, he asked the deceased if he had a gun, the deceased said, no. The deceased then told him to go and put the gun up, that he did not need any gun. The deceased then started to cross over the fence and the defendant hit him with the shot gun, and then fired a shot

over his head. The defendant backed off fifteen or twenty steps with the deceased following him up. He then fired the fatal shot, the charge entered the left breast above the heart. Death was almost instantaneous. The deceased did not have a weapon of any kind.

For the state Cecil Gatewood testified that he lived near the town of Dutton; that he was at the Ballard place on the day of the tragedy; that Arthur Goodnight lived a mile and a quarter west of the Ballard place; that he was standing about seventy-five yards northwest of the parties when the shooting occurred, and saw Jim Ballard fire the shot that killed Arthur Goodnight; that they were five or six steps apart when the fatal shot was fired; that he was "a great friend of Jim Ballard."

As a witness for the defendant Mrs. Bessie Goodnight testified that she was the widow of the deceased Arthur Goodnight; that on Thursday, with her husband and children she went to her father's house and stayed there that night so that her husband could help her father spread his alfalfa the next day; that the next evening her husband came in from the hay field for supper and became angry because they did not save any ice cream for him, and said he was going home; that her mother asked him not to go, but he got into his buggy and told witness if she was going home with him to get in, and she went to get ready and looked out and saw him driving away; that about 11 o'clock the next day he came and got the little girl off the porch; that he had his single barrel shot gun leaning against the seat by his side in the buggy at that time; that about an hour or two later, he drove down the road in the buggy with the child, that as he drove by she waved good-bye to him and he stopped. That he had often made threats against the Ballards, and she had told her brother Jim about these threats; that when he stopped she asked him where he was going, and he said, "come down here and talk to me." That as she started to go she asked her brother Jim to go with her; that she was carrying her baby in her arms; when they reached the fence her husband said to Jim, "I will have you arrested before night for bringing that gun with you," and

Jim said, "Go ahead, that's all right, we have an officer at the end of the road for you." That her husband got out of the buggy and started towards her brother, and Jim told him to stand back, that he did not want to hurt him, "that he came over the wire and grabbed for Jim, and Jim knocked the lick off with the gun," and she told her husband to stand back and not get any closer to Jim. That when the second shot was fired they were four or five steps apart.

James Ballard, the defendant testified that he was at Verden attending a Fourth of July picnic, and did not return home until about midnight that night; that his mother told him about Arthur Goodnight going away angry that evening and told him about what his sister had said about their trouble, and that he had threatened to kill all of the Ballards; that he was working in the field the next day and came to the house for water and the folks said that Goodnight had been there and stole the little girl, and that he had his gun with him, and his sister, Mrs. Goodnight told him about the threats her husband had made against "her, him and all of us," that when the deceased drove by Mrs. Goodnight waved her hand at him and he stopped; that he told his sister not to go down there to him; that she started and he took his gun and went along to protect her. That when they reached the fence the deceased asked him where he was going with that gun, and told him to go back, and he did not make any answer; that the deceased said, "I will get you," and got out of the buggy and came at him; that as he was crossing the fence he struck him with the gun and shot over his head to scare him and try to keep him back; that he kept on coming and witness kept backing from him and he shot him.

He further testified as follows:

"Q. How far were you from him the last time you shot? A. About the same distance when I first shot at him.

"Q. Did you shoot to kill that shot? A. Yes, sir.

"Q. State to the jury why you shot the last shot to kill? A. I run from him and backed from him as long as I could, and I thought that was the only chance to save my life.

"Q. How large was he? A. Weighed more than two hundred pounds and more than six foot tall."

On cross examination he stated that he did not remember whether or not his sister asked him to go down there to the road with her.

In rebuttal, Dr. Messner testified that he lived at Dutton, and the Ballards lived about a mile west, and that Arthur Goodnight lived about three hundred yards east; that he had a store there and that Arthur Goodnight passed the store three times that day; that he talked with him about ten o'clock that morning while he was sitting in his buggy and that he did not have a shot gun, and he drove east and about twenty-five minutes later he returned, going towards his home with the little girl in the buggy with him; that Mr. Goodnight stopped and he went out to his buggy with some lunch stuff and put it in the back part of the buggy and he gave some candy to the little girl. That he did not see any gun in the buggy and about an hour later he drove past the store and the little girl was in the buggy with him. . .

Mrs. Dr. Messner testified that on the day of the tragedy the deceased stopped at their store three times; that the first time he was going toward Ballard's and stopped at the store to use the phone; that she saw his buggy plain, and did not see any gun; that the little girl was with him when he came back and she stood by the buggy talking to him and did not see any gun.

The errors assigned are predicated upon exceptions to the charge of the court. Only one of the instructions excepted to is complained of in the defendant's brief. It is contended that the testimony of the defendant and that of Mrs. Bessie Goodnight shows conclusively that the defendant abandoned the conflict with the deceased and attempted to withdraw from the same, and that the deceased pursued the defendant after such withdrawal, and that under said testimony, conceding that the instruction complained of to be the law, the court should have gone further and instructed the jury that from that time forward, the defendant had the right to defend himself and was entitled to the benefit of the law of self-defense.

Under the law and the evidence in this case the issues to be determined by the jury were murder or manslaughter in the first degree, or justifiable homicide in self-defense. The action of the court in.submitting to the jury the issue of manslaughter in the second degree is inexplicable. However, no objection was made or exception taken by the defendant to this part of the charge of the court. It is a sufficient answer to say that the rule is that if the court commits error in instructing the jury upon the law applicable to a higher degree, of such crime and the jury renders a verdict of guilty of the lower degree, the defendant cannot complain, and a defendant who has been convicted of manslaughter in the second degree, cannot complain that the court charged the law of manslaughter in the second degree, and that the evidence did not justify such a charge.

*Weatherholt* v. *State,* 9th Okla. Cr. 161, 131 Pac. 185.

The jury has the right to determine the degree of the crime committed in a homicide case, yet its determination must be based upon evidence. It is for the court to determine what degree of homicide the evidence tends to establish, and it is the duty of the court to confine its charge to such degrees. Where the killing with a deadly weapon is admitted, and there is no pretense that the killing was accidental, and where the defense is justifiable homicide in self-defense, there can be no issue of manslaughter in the second degree.

Upon the undisputed facts and the testimony of the defendant in his own behalf, he was guilty at least of manslaughter in the first degree. However, upon the record before us, our duty is performed by an affirmance of the judgment. The judgment of the District Court of Grady county is therefore affirmed.

FURMAN and ARMSTRONG, JJ., concur.