## J. K. INMAN v. STATE.

No. A-3824. Opinion Filed Nov. 29, 1922.
(210 Pac. 742.)

(Syllabus.)

1. Homicide—Evidence—Demeanor of Accused Prior to Offense to Show State of Mind. Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing.

2. **Trial—Instructions—Requisites as to Exceptions and Requested Instructions.** Requested instructions must be in writing and presented to the trial court, and exceptions to the general charge must be made before the same is settled and read to the jury.

3. **Appeal and Error—Failure to Present Error Below—Instructions.** Where no such timely objection or proper request is made, any error, if any, in the general charge will not be reviewed on appeal unless fundamental.

4. **Homicide—Manslaughter—Conviction of Lesser Degree Than Evidence Justified not Ground for Complaint.** Where defendant is charged with murder, and under the law and facts might properly have been convicted of manslaughter in the first degree, a conviction of manslaughter in the second degree is error of which defendant will not be heard to complain upon appeal.

Appeal from District Court, Comanche County; Cham Jones, Judge.

J. K. Inman was convicted of the crime of manslaughter in the second degree, and he appeals. Affirmed.

On a charge of murder, defendant was, in the district court of Comanche county, on the 27th day of January, 1920, convicted of manslaughter in the second degree, and sentenced in accordance with the verdict returned to serve a term of one year's imprisonment in the county jail.

The killing occurred on a business street of the town of Elgin in the forenoon of October 27, 1919. Deceased, J. F. Ballew, and defendant were neighbors, and at the time lived in the east part of town.

About 10 or 15 minutes before the commission of the homicide, defendant and Jesse Ballew, a son of deceased, had some trouble, in which defendant called Jesse Ballew from a barber shop and assaulted him by striking him over the head with his pistol and kicking him. Each party to this difficulty evidently used abusive, profane and vulgar language toward the other, and defendant admitted that he was mad at

the time. Defendant claimed this first trouble arose because Jesse Ballew had accused him (defendant) of having stolen some horses from him, and defendant called Ballew out of the barber shop to find out about the report.

Immediately after this first difficulty, defendant started to go home, and when he had gone about a block and a half from where the difficulty occurred, Kelly Hoffer, a merchant, called to him, remarking, "Hey, you kinder had your Dutch up, didn't you?" At this remark defendant didn't say anything, but turned around and came back to where Hoffer was standing; Hoffer at that time was standing on the porch in front of his store. Defendant and Hoffer continued to remain on the porch in front of Hoffer's store talking for several minutes, when Hoffer says defendant remarked, "There comes the old man now," or "Here comes Mr. Ballew now." Hoffer is not certain which of these remarks defendant made. Defendant claims that Hoffer called attention to the fact that deceased was approaching.

When deceased was first seen, the undisputed evidence is that he was coming in a trot from the east, and had his hands down holding to the lower corners of his coat on each side. According to Hoffer's testimony, Ballew came straight down the street west until he got within about 30 or 40 feet east of where he and defendant were, and then deceased took a "beeline straight for the porch;" that the porch was about 25 feet long east and west and 8 feet wide north and south, and had an awning above it; that the store faced the north, and that there were four posts along the south side of the porch, and that defendant was standing near the southeast post; that Ballew came right straight toward Inman, and that the only thing Hoffer heard Ballew says was, "Inman, you God damn son of a bitch;" that at the time Ballew made this remark he was about 25 feet away from Inman, running toward the porch

in a good stiff trot; that when Ballew started to curse he began to pull at his coat like he was going to take his coat off; that about this time Inman fired a shot at Ballew; that witness was then standing back of Inman and could see past Inman and see Ballew; that as soon as Inman shot, Ballew staggered back east and toward the north, and holloaed, "Oh!" very loud.

Further describing the difficulty, witness Hoffer testified as follows:

"A. Well when the first shot was fired he staggered as I say east and north possibly 8 feet or something like that, it might have been a little further than that, I don't believe it was over 8 or 9 feet on a direct line from where he was shot the first time and the second time, but it was done pretty quickly, and it seemed to me like he lost control of himself when he was shot the first time he kinder limped and throwed his eyes closed and, of course, as I say, the second shot was fired right away and at the second shot he collapsed.

"Q. Where were you standing when the second shot was fired? A. Right inside of the door and here is where he fell, right about here (indicating on map). And here is where he was when the first shot was fired."

The witness Hoffer was the only person besides defendant who saw all the difficulty between deceased and defendant. Defendant's testimony relative to what occurred at the time of the killing differs somewhat from that of Hoffer. Defendant testified as follows:

"A. Mr. Ballew; I was talking to Mr. Hoffer. This porch fronts the south and I was up on the porch with my back to the southeast and Mr. Hoffer was northwest of me setting on a nail keg. Well, Mr. Ballew came running up holding his coat about this way (indicating) and about the time he got in about 30 feet of me I says, 'Mr. Ballew, stop, I don't want to hurt you.' Well, about that time he seemed

to get faster and he ran up within about four feet or about this corner post, and he come like angling to this man and I was standing up here with my hand on this post and he came about this far; well, I turned around standing about here and he just turned his coat loose like this (indicating) and he went down in here (indicating) and he says, 'You bastardly son of a bitch, come on with that gun'; and he made a grab at his gun, and it seemed to hang and about that time I shot the first shot and struck him about here and he staggered this way, about this far; about that time he came with his left hand and reached for his gun and then the second shot hit him; he had his head this way and the second shot hit him here and he dropped down with his arm under him just like that.

"Q. Where did he first commence swearing, how far was he away when he first commenced swearing at you? A. Well, I would think it would be about 30 yards, the first thing he began to say was calling me a God damn bastardly son of a bitch, and he kept that up until he got in about 20 feet and I hollered at him to stop. I says, 'Stop, Mr. Ballew, I don't want to hurt you'; and he ran a little faster and got nearly to the store when he went after his gun.

\* \* \* \* \* \*

"Q. When you saw him reach for his gun, what did you do? A. Well, I jerked my gun as quick as I could after he started with his gun.

"Q. The fact of the business is if Ballew's gun had not hung—A. If you will give me the gun I'll show the jury how it hung to the best of my ability.

"Q. I will ask you one question, did you have time to take aim or did you shoot as quick as you could? A. Yes, sir; I shot him with a double action gun as quick as I could shoot it.

"Q. How many times did you shoot? A. Twice.

"Q. You said the gun of Mr. Ballew hung in his pocket? A. Now as it hung, I don't know where it hung, but here is

where I suggest it hung because when he came over here he released the gun and got it about this far up when the second shot was fired and then he fell with the gun just about like that with his arm under him, as Mr. Coffin testified.

"Q. When you fired the second shot; the evidence of Dr. Martin, Mr. Wisner and Mr. Hoffer was that the second shot struck the head about here, I will ask you how it was that wound was made there? A. Well, the fact is I could not say for certain which bullet hit him at a certain place; I know the second shot hit him because it knocked him down, he had his head in this position—he turned his head this way when he went to release his gun with his left hand and that is the time the bullet hit him here and knocked him down.

"Q. He was looking down trying to release his gun? A. Yes, sir; he turned his head that way and jerked the gun, as he got it this far up.

"Q. You don't know whether he jerked the button open on his overalls or not? A. No, sir; I don't know.

"Q. What did you say or do after the shooting? A. Why, I turned to Mr. Hoffer, he came out from where he ran to; I said, 'Mr. Hoffer, you see that I had that to do,' and that is all I said.

"Q. Was Mr. Hoffer—did he appear to be considerably excited at the time? A. Well, he looked more sick than excited; he has heart trouble and I believe he seemed to be sick; looked awfully white.

"Q. He didn't say anything? A. I believe he just shook his head like that.

"Q. Shook his head you say; you say you told him that you had this to do, did he nod his head or say 'yes'? A. He seemed to be sick; I don't know as he said anything.

"Q. Did you have any enmity against Mr. Ballew? A. None whatever.''

Concerning the trouble with Jesse Ballew, defendant testified as follows:

"Q. You heard the evidence of Jesse Ballew relative to the altercation that occurred about 30 minutes before this? A. Yes, sir, I heard his testimony.

"Q. I will ask you to state the facts as they occurred at that time and where you had been prior to that time of seeing Jesse Ballew that morning? A. I broke a spring out of my car; I had been to my mother's down at Blanchard a day or two before that and I broke a spring out of my car, and took it to Fletcher early that morning and left it in Wilson's garage. Before that though I had went to where I have got a place in New Mexico, I had been gone about forty days, and I had my gun in the side pocket of my car and when I left my car in the garage Mr. Wilson he called my attention to locking my tool box up and I had no key for it and I said I will get my gun, it is in the side pocket and I got it and stuck it in my pocket and I rode from there back to Elgin with Dr. Gamble in his car, and as I came up through town from the post office Jesse Ballew was sitting in the barber shop. I had been to Blanchard, a few days before that Jess had been down there and had taken a city marshal out and searched over the pastures, he was hunting me they claimed for stealing horses. (Objected to for the reason it is hearsay, incompetent, irrelevant and immaterial, this witness did not see Jesse Ballew down at Blanchard.)

"Court: Overruled. (State excepts.)

"A. The city marshal at Blanchard told—

"Court: Don't state any conversation you had with any one at Blanchard.

"A. Well, I found Jess Ballew had been down there, circulating the news over where my mother lives—and she is 80 years old—she told me about it too, about me being a horse thief. And as I came back through town I called Jesse Ballew out to straighten this matter up with him. I asked him about this and he said he had not been down there; I said,

'Jess, I have got the goods on you, you can't deny it, the city marshal and the sheriff told me you were down there.' He says, 'You are a God damn lying son of a bitch,' and ran his hand in his pocket. I jerked my gun out and hit at him and it hit him on the elbow and he ran; I kicked him as he ran and cursed him a little and he did me too; just like anybody most will do in a fight of that kind. Jesse told me, he said, 'You put up your gun, you God damn son of a bitch you, and I'll beat you to death,' and I says, 'Jess, you have already threatened my life too much for me to put up the gun,' and about that time Vawter came out and says, 'Mr. Inman, I wish you would go on away, there are ladies here.' About that time Jess says, "If you don't put your gun up I'll have the old man bring my gun and I'll kill you, you God damn son of a bitch.' I turned around and walked to the post office and started on home. I did not think about any more trouble. The fact of the business is I intended to come down town, he said he was going to have me arrested, and I intended to come down town and give myself up. I came on up by Hoffer's and straight by his place about three-quarters of a block and he called me back; and then this old gentleman came up with his gun and started to kill me with his gun.

"Q. I will ask you if in the altercation with Jesse Ballew if you told him to get out of town and if he didn't get out of town you would kill him? A. No, sir; I did not.

"Q. You made no threats to kill him? A. No, sir; I did not; if I had wanted to have killed him I could have killed him then, I didn't want to kill Jesse Ballew; if I had wanted to do so I could have done it, I didn't want to kill him at all."

On cross-examination, defendant testified in part as follows:

"Q. You had known Jesse about how long? A. Well, about four years; I bought my property there last August four years ago; I believe it was.

"Q. You didn't feel so kindly toward Jess, did you? A. Well, I have not felt very kindly toward Jess for two or three years; him and I have not been good friends.

* * * * * *

"Q. Now you did come back from Blanchard and you did go down in town on the morning of October 27, 1919? A. Yes, sir; I came through town as I came from Fletcher.

"Q. Well, you did come down town to the barber shop owned by Mr. Stackhouse? A. Yes, sir. No; I didn't go in the barber shop.

"Q. Did you go to the shop? A. Yes, sir.

"Q. Did you call Jesse Ballew out? A. Yes, sir; I did.

"Q. At that time you had not seen Jesse Ballew for weeks? A. No, I had not seen for some time.

"Q. You called him out; where did you get him to go to? A. We walked down the street about half a block I suppose.

"Q. At that time did you have in your possession your gun? A. Yes, sir.

"Q. You tried to hit Jesse with your gun? A. Yes, sir.

"Q. You did hit him several times? A. No, sir.

"Q. How many times? A. I hit at him once and he threw up his arm, and I struck him a light lick as Dr. Martin testified to.

"Q. You did strike him with that gun several times? A. No, sir.

"Q. Well, you did strike him twice? A. No, sir; once.

"Q. You knocked his hat off? A. No, sir; when he throwed up his arm he knocked it off.

"Q. You did not hit him in the back of the head? A. No, sir.

"Q. You kicked him? A. Yes, sir.

"Q. And then punched him in the ribs with your gun? A. I shoved my gun up that way when he went after his knife.

"Q. Jesse told you he would fight you fair handed if you would throw the gun away? A. Well, after so long a time he did.

"Q. You did not throw the gun away did you? A. No, sir.

"Q. You kept on poking that gun at him as he walked up the street? A. No, sir.

"Q. Did you poke him with it as you walked up the street? A. No, sir.

"Q. And didn't you kick him after you poked him in the side with your gun? A. I kicked him one time.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now then do you say at any time between the time you kicked the boy near the telephone office and the time he went in the store that he told you he was going home to get his gun? A. He said he would have the old man bring his gun.

"Q. And there were several of those parties out there when he said it? A. Yes, sir.

"Q. You mean to tell the jury that is true? A. Yes, sir.

"Q. Now you were pretty mad, weren't you as a result of that altercation? A. Well, I was mad; I had a right to be mad.

"Q. And you continued to be mad, didn't you, all that morning? A. Yes, sir.

"Q. When did you cool off? A. Well, I cooled off right away.

"Q. You got all over it in just a minute did you? A. Yes, sir.

"Q. And you were not excited or mad at the time you went to have the conversation with Kelly Hoffer? A. No, sir."

Concerning the occurrences immediately preceding the shooting, defendant testified as follows:

"Q. Now, I believe you said that Mr. Ballew got within about 30 feet of you, and you said something to him? A. Yes, sir.

"Q. Now, you said it with the purpose and with the intention of having him hear it so he would stop, didn't you? A. Yes, sir.

"Q. You said it loud enough so he could hear it 30 feet? A. I would not say exactly how far, about that far.

"Q. Tell the jury what you said to him when you say he was about 30 feet from you? A. Well, I said, 'Stop, Mr. Ballew, I don't want to hurt you.'

"Q. What had he said prior to that time? A. Well, he was saying, 'God damn,' some of it is too indecent to speak before ladies if the court please.

"Court: Go ahead.

"A. He said, 'You God damn, * * * son of a bitch, I am going to kill you.' I said, 'Stop, Mr. Ballew, I don't want to hurt you.'

"Q. Said, 'I am going to kill you'? A. Yes, sir.

"Q. That was in a loud voice? A. He was talking fast and loud all the time.

"Q. You could understand it without any trouble? A. Yes, sir.

"Q. Kelly Hoffer was 6 or 8 feet from you? A. I think about 4 feet.

"Q. He was not over 6 or 8 feet from you at the time you told this man to stop? A. No, sir.

"Q. No reason in the world why he could not hear you tell that man that? A. No, sir.

"Q. Nothing to keep him from hearing that conversation? A. That is about the time Hoffer ran to get out of line.

"Q. Do you say Hoffer started to run when the man was 30 feet away? A. Well, just about the time; he come up close; he was running all the time.

"Q. Was that when he was 30 feet away that Hoffer started to run? A. When he started to make this threat he was running toward me probably 30 feet away, and by the time he got through making this talk he was probably in 4 feet of me and then he says, 'Come on with that gun, you God damn bastardly son of a bitch.'

"Q. Do you say Hoffer started to run when Ballew was about 30 feet from you? A. Well, he had got up closer than that when Hoffer ran.

"Q. The man had not got closer than 30 feet when Hoffer started to run? A. No, sir; I say he was closer; he started this cursing when he was 30 feet away and he was coming toward me all the time and he kept getting faster and he did get in about three feet of me.

"Q. When he was within 30 feet was the time when you told him to stop? A. Well, something like that.

"Q. Now then, where was this man's hands at that time? A. Well, he were holding them about like this.

"Q. He had been running holding his coat with his hands up to that time? A. He had not had them this way; he had had them about like this.

"Q. You mean to say one hand higher than the other? A. Yes, sir; he seem to be holding his gun this way.

"Q. He was not holding both hands down like this? A. The best I could judge it was about like this.

"Q. Was his coat open when he was within 30 feet of you? A. I think it was buttoned about like this.

"Q. Did it remain buttoned all the rest of the time so far as you know? A. I am not sure it was buttoned, but I think it was at the top.

"Q. What do you say as to whether it did as a matter of fact remain buttoned up until you shot him? A. I did not say it was buttoned, I am not sure that it was.

"Q. Did it remain fastened or closed as if it was buttoned all the time until you shot him? A. I did not say it was fastened.

"Q. Well, closed as if fastened all the time up to the time you shot him? A. I didn't say it was closed as if fastened. (Object to argument with witness.)

"Q. Tell the jury in what position you say his coat was at the time you shot him? A. Well, he just—when he got up pretty close he turned his coat loose with his hand and throwed his hand in here for his gun, and he left his coat probably like mine is. It is possible it was buttoned, I am not sure, but after he got up close, when he got probably as close as this man over here, he stopped and squared himself this way and he throwed his coat back, I could not say it was fastened at the top or not.

"Q. Was he coming directly facing you all the time he was coming, from the time you told him to stop at about 30 feet until you fired the first shot? A. Well, when he stopped that throwed him a little this way. When he stopped and throwed hisself this way the first shot struck him here I think, the way the doctor says it come out over here.

"Q. Was he facing you directly? A. No, sir; not directly.

"Q. As I understand you to tell the jury he was within 4 feet of you when you shot? A. No, sir; I did not say that; I should judge 3 or 4 feet.

"Q. He was either 4 feet or closer when you shot? A. I should not say, probably it was further than 4 feet.

"Q. Well, what do you say about it? A. I should say just like I did while ago, 3 or 4 feet or maybe 5; he was close enough to powder burn.

"Q. What was the size of the gun you shot? A. Thirty-eight Colts.

"Q. On a forty-five frame? A. No, sir.

"Q. It is generally recognized as a very powerful gun? A. Well, those Colts guns are good guns.

\*     \*     \*     \*     \*     \*

"Q. When the first shot struck him, what did he say? A. Well, beween the two shots Mr. Ballew hollered.

"Q. What kind of holler; what expression did he make? A. He says, 'Oh!' in a loud voice.

"Q. Said, 'Oh! Oh!' didn't he? A. No, sir, just said, 'Oh!'

"Q. It was a moan? A. Probably so.

"Q. That was between the shots. A. Well, about the time the shots were being fired; they were so close together, I could not distinguish about that.

"Q. I will ask you if, as a matter of fact when the first shot was fired, if that man's hands did not fall and his eyes didn't close? A. No, sir; I didn't see his eyes; he had his hands this way trying to get his gun.

"Q. You saw him try to release his gun with his left hand after the first shot? A. Just about the time both shots were fired, he tried to release it, which he did—release it and drew it this high.

"Q. You told the jury after the first shot was fired and before you fired the second shot that his gun seemed to hang, and he reached over with his left hand after the first shot was fired and released it? A. I think about the time the first shot was fired, probably a second after, but about the time both

shots were being fired; he jerked at his gun a time or two before I ever got my gun, the fact of the business is if his gun had not hung I would have been killed instead of Mr. Ballew.

"Q. You, of course, feel you acted in perfect self-defense? A. I certainly do."

Concerning the location of the wounds, Dr. C. M. Martin testified as follows: One over the left collar bone or clavicle; one on the left side of the head toward the back, above and behind the ear on the left side; did not try to follow or probe the direction of the bullet; did not think the wound in the shoulder a fatal wound, but the one in the head was fatal.

A pistol was found in the trousers of the deceased. There is considerable other evidence in the record, but the foregoing statement is sufficient for the purpose of this opinion.

Lewis Hunter, Ben Goff, and J. F. Thomas, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). Among other assignments of error it is contended that the admission of evidence of the difficulty between defendant and Jesse Ballew, the son of deceased, from 10 to 30 minutes prior to the killing, was erroneous and prejudicial to defendant. With this contention we cannot agree. This evidence was admissible for the purpose of showing that defendant was armed and in an angry mood a short time prior to the killing. Earl Tallon v. State, 22 Okla. Cr. 89, 210 Pac. 309; Williams v. State, 4 Okla. Cr. 524, 114 Pac. 1114; Hampton v. State, 7 Okla. Cr. 291, 123 Pac. 571, 40 L. R. A. (N. S.) 43.

It is also contended that the trial court erred by refusing to give a special instruction requested by defendant. No

written instructions were presented to the trial court by counsel for defendant. After the court had delivered his general charge to the jury, counsel for defendant orally took the following exceptions, and made the following request:

"Comes now the defendant and excepts to instruction giving manslaughter in the first degree and manslaughter in the second degree and requests the court to instruct the jury that if the defendant is found guilty of the charge in the indictment, their verdict should be murder in the first degree, and if they fail to find beyond a reasonable doubt from all the evidence that the defendant is guilty as charged in the indictment, that he be acquitted."

The fifth subdivision of section 5870, Revised Laws 1910 (criminal procedure), provides as follows:

"When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions, and may give or refuse any instructions asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge; if modified, modification shall be shown in the instruction. When the instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury."

The foregoing statutory provision clearly contemplates that the instructions should be settled before being read to the jury. Boutcher v. State, 4 Okla. Cr. 585, 112 Pac. 762.

Requested instructions must be in writing and presented to the trial court before the general charge is settled and read, otherwise the request comes too late. Williams v. State, 12 Okla. Cr. 39, 151 Pac. 900.

In the case of Russell v. State, 17 Okla. Cr. 164, 194 Pac. 242, it is held:

"The trial court is required to settle, and counsel are required to take exceptions to, instructions before the same are read to the jury.

"When requested, it is error for the trial court to refuse to permit counsel for the defendant to have a reasonable opportunity to be heard upon the instructions to be given to the jury before the same are read to the jury."

It is as much the duty of counsel to present requested instructions and to take exceptions to instructions before the same are read to the jury as it is the duty of the trial court to give counsel an opportunity to be heard upon the instructions. The provision of the statute in each respect is salutary, affording to defendant and the trial court that protection which prevents an unfair advantage to be taken of either.

This court, since the early decision in Boutcher v. State, supra, has repeatedly called the attention of counsel to the necessity of making timely objection to and request for instructions, if review is to be had in this court, otherwise the error, if any, will be considered waived unless fundamental. No fundamental error is presented by this assignment.

It is also contended that there is no evidence in the record to support a conviction for manslaughter in the second degree. Under the testimony of the state's eyewitness, Hoffer, defendant should rightfully have been convicted of manslaughter in the first degree; and indeed under his own testimony a conviction of manslaughter in the first degree would not have been disturbed by this court had the trial court, after seeing the witnesses and hearing the testimony, let such a verdict stand.

This record discloses that defendant (and he admits it) was on that day carrying a pistol in violation of the laws of the state; that he was a short time before the commission of the homicide in an angry mood, and had made a vicious assault upon the son of deceased. He was not in that calm, deliberate frame of mind indicative of a desire to avoid trouble, but rather in a frame of mind seeking trouble. According to the testimony of Hoffer, after defendant had fired the first shot and had apparently injured and disabled deceased to such an extent that he closed his eyes and uttered in a loud tone of voice the exclamation "Oh!" and staggered away from defendant, apparently in a helpless condition (which facts must have been known to defendant, as according to his own testimony he had a very acute recollection of the various positions that deceased assumed during the entire difficulty) the defendant again shot deceased. Defendant showed no inclination to avoid a difficulty with deceased, neither did he show any inclination to show mercy toward him, and the jury reasonably had a right to conclude that defendant, apparently in the heat of passion, unnecessarily shot deceased the second time when he knew deceased to be in a helpless condition and unable at that time to attack him.

If any error was committed in finding defendant guilty only of manslaughter in the second degree, it was error of which defendant in this court will not be heard to complain. This doctrine is well established by a long list of authorities, among which are the following: Weatherholt v. State, 9 Okla. Cr. 161, 131 Pac. 185; Warren v. State, 6 Okla. Cr. 1, 115 Pac. 812, 34 L. R. A. (N. S. ) 1121; Irby v. State, 18 Okla. Cr. 464, 197 Pac. 526; Harper v. State, 20 Okla. Cr. 43, 200 Pac. 879, 882; Smith v. State, 20 Okla. Cr. 301, 202 Pac. 519, 520; Lytton v. State, 12 Okla. Cr. 204, 153 Pac. 620; Wilmoth v.

State, 20 Okla. Cr. 453, 203 Pac. 1055; Ballard v. State, 12 Okla. Cr. 277, 154 Pac. 1197.

For reasons stated, the judgment is affirmed.

DOYLE, P. J., and BESSEY, J., concur.