## CECIL JACKSON v. STATE.

No. A-10577.    April 23, 1947.

(179 P. 2d 924.)

140

J. M. Springer, of Nowata, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J.   The defendant, Cecil Jackson, was charged by information of the crime of murder. It was alleged that in Cushing, Payne county, Okla., on February 6, 1944, with premeditated design to effect the death of Houston Tyner, the said Cecil Jackson did shoot Houston Tyner in the body with a .38 pistol and inflict upon him mortal wounds from which he did linger and die. At the trial the defendant, Cecil Jackson, was convicted of second degree manslaughter by the jury and sentenced to four (4) years in the penitentiary. From that judgment and sentence, this appeal was perfected.

The defendant, in his brief, argues the following assignments of error, to wit:

1. The court erred in its admission of illegal, unlawful and incompetent evidence which was highly prejudicial and prevented the defendant from having a fair and impartial trial.

2. The court erred by excluding competent, relevant and material evidence from the consideration of the jury.

3. The court erred in its instructions to the jury and particularly in its instruction on manslaughter in the first degree and manslaughter in the second degree, to which the defendant at the time excepted and still excepts.

4. The verdict of the jury, and judgment and sentence of the court are not supported by the evidence.

We shall consider the assignments in the following order: The fourth, first, second, and third.

In considering the fourth assignment, we must carefully examine the entire record. There are sharp conflicts in the testimony offered by the state and for the defendant. In this connection, in a long line of decisions this court has held, "where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts." A few of the more recent cases so holding are: Chapman v. State, 84 Okla. Cr. 41, 178 P. 2d 638; Landon v. State, 82 Okla. Cr. 336, 166 P. 2d 781; Spann v. State, 69 Okla. Cr. 369, 103 P. 2d 389; Drennan v. State, 69 Okla. Cr. 348, 102 P. 2d 952. The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in the evidence, on which the jury can reasonably conclude that the defendant is guilty as charged. Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111. In light of these principles, the first question is: "Upon what

facts did the jury base their conclusion as to the guilt of the defendant?" The second question: "Was the evidence sufficient?"

Some things appear quite clear from the record. The defendant, Cecil Jackson, and his wife, Mamie Jackson, were living at the Plaza Hotel in Cushing. Allen Macklin and Pearl Nobles were also living at the Plaza. Houston Tyner, deceased, the victim in this case, and his wife and two small boys were likewise living at the Plaza Hotel.

The defendant came in from work about 4:30 p. m., February 5, 1944. He ate no evening meal. About 6:30 p.m. he and his wife, Mamie Jackson, were joined in their room by Pearl Nobles and Allen Macklin for a little social whisky drinking. Apparently Allen Macklin furnished the whisky. They continued the party until about 8:30 p. m. when they decided to go to a place known as Grubb's Corner. Here they purchased at least two (2) quarts of beer and did some more drinking. Jackson, his wife Mamie, and Macklin testified there was no whisky drunk at Grubb's, but Pearl Nobles testified that there was about one-fourth ($\frac{1}{4}$) of a pint of whisky drunk at Grubb's Corner. She said she saw Macklin drink some whisky and Jackson drink beer. While Jackson and Macklin continued drinking, Mamie Jackson and Pearl Nobles went back into the Grubb's living quarters. Whether the defendant and Macklin drank any more whisky at Grubb's is a matter of logical inference to be drawn by the jury. There is substantial evidence they had it at that point and that one of them took a drink of whisky. It is not unreasonable to conclude, in light of other testimony, that Jackson was drunk; that they both did drink some more whisky at Grubb's Corner.

Mrs. Tyner testified that when she first saw Jackson that night he was drunk and continued that way up to and

after the shooting. In this she was corroborated by the night sergeant of police, John Coy, who booked the defendant in at the jail about 2:30 or 3:00 a.m. after the killing. He said that Cecil Jackson was drunk; so drunk his tongue was thick and he didn't form his sentences as he would when sober. Mrs. Tyner was further corroborated by the Chief of Police of Cushing, Floyd Stroup, who testified that the defendant was intoxicated at the time of his arrest. The testimony of Mrs. Tyner that the defendant was drunk is further substantiated by the testimony of Lee Stiles, deputy sheriff, to the effect that the defendant in a conversation with Mamie Jackson, on the way to the county jail from Cushing to Stillwater, about 2 p. m. on February 7th, said he thought the whole thing occurred before the dance. The defendant did not have a clear picture of the sequence of the things that did happen, if we are to believe the deputy sheriff. The jury, weighing all the evidence, undoubtedly concluded the defendant was drunk when he shot Houston Tyner.

They undoubtedly believed that the other witnesses who participated in the drinking, except Pearl Nobles, were incapable of telling a reliable story. They believed her story that after leaving Grubb's Corner, they went to a dance and then to Razz's Cafe for food. That here Mrs. Jackson became angered at her husband and left by herself and returned to the Jacksons' hotel room; that the remaining three of them finished their food before going back to the hotel.

Undoubtedly, they believed that Mrs. Tyner told a creditable story and they believed her version of what happened, particularly in view of the substantial corroboration of her story in many minor details incident to the shooting. She said that she first saw Mamie Jackson by

herself about midnight; that Mamie had been drinking and was hic-coughing, crying, and hysterical; that shortly thereafter, Cecil Jackson and Pearl Nobles and Allen Macklin came; that Mamie and Cecil Jackson argued and that Cecil slapped Mamie Jackson. She testified that her husband, Houston Tyner, had called her earlier that his car was bogged down in the mud south of town. Mrs. Tyner said she went to the Jacksons to get one of the party to go out and help her husband. She said Allen Macklin said he and Pearl would go, that Cecil Jackson was too drunk; that they (the three of them) left, got to the bottom of the steps and met her husband as he drove up in his car; that her husband parked across the street and disappeared with the man who came with him. She went to her own apartment and remained there for one (1) hour and a half (½); that the next time she saw her husband, he came to her apartment with Cecil Jackson to get her to help quiet Mamie who was still hysterical; that she went and tried to get Mrs. Jackson's mind off her trouble. Finally, Cecil Jackson wanted a pint of whisky, that he offered to put up $2 on it—Tyner finally offered to put up $1. Then Jackson wanted to roll dice for it. She said that she and Mamie Jackson left, went to her apartment to make some coffee to help sober Mamie up. Jackson and Tyner were rolling dice. Shortly thereafter, her husband, Houston Tyner, came in and said Jackson wanted to wrestle, which he had done, and he, Tyner, had thrown him on the bed and Jackson was hurt. They all three returned to the room and found Jackson on the bed groaning. In this connection the record shows that sometime prior, Jackson had sustained a pelvis injury in a rodeo. Jackson complained that Tyner had re-injured his pelvis. They wanted to call a doctor and Jackson said not to do it but wait 'till morning. Thereupon, Tyner left and called

Macklin in to see if any bones were broken. Pearl Nobles also came in. Jackson whirled off of the bed and said he was going to get his gun and kill the damn son-of-a- ——— (Pearl Nobles also testified to this statement, in substance, and to the fact that she went and told Tyner what the defendant said. She then went to her room and stayed there) ; that Tyner came back in a jocular mood and Jackson asked him why he tried to kill him; that Jackson then became very abusive; that she left her husband and Cecil and Mamie Jackson there alone and went to her apartment. Mamie came back a few minutes later and asked her to come back; that Tyner had Jackson's arms pinned to his sides and had him bent back over the bed. She asked Tyner to stop. He said he would not until the defendant Jackson agreed to quit fighting and trying to hurt somebody. Then, she said, she got hysterical herself and told them they were all drunk and that if they didn't stop she was going to call the police. Then she left and all the other three followed her out into the hall, Tyner holding Jackson's hands, stating he would let him go if he would quit and not get his gun. Jackson promised he would quit and said he wanted to go to the bathroom. Tyner released him and went up the hall. Jackson whirled and ran back into his room to get his gun. Tyner ran and got his jacket and disappeared down the stairs out of the hotel. Mrs. Tyner said she then went to her apartment and was followed by Mrs. Jackson. They were together in the apartment and Jackson was out in the lobby with his gun. A short while later, she said, Tyner scratched on the window screen opening on to the roof of an adjoining building. She opened the screen and let him in and told him Jackson was in the lobby with his gun waiting for him. Tyner told his wife he would make him drop the gun. He then got a paring knife and stepped out into the hall—Jackson came around the

corner with his gun leveled toward Tyner. Tyner lunged forward and grappled for the gun and Jackson fired. She heard her husband cry he had been shot. She said she saw Jackson standing over her husband with the gun pointed toward him. As she ran down the steps to get the officers she heard a second shot, she testified. Then she went to the police station and reported her husband had been shot and that she was afraid to return until the officers got there. While there, she phoned back to the hotel to ascertain if they had arrived. She was told that they had.

In relation to the telephone call, Mrs. Jackson testified that Mrs. Tyner called her over the phone and asked if anyone was hurt. This testimony on the part of Mrs. Jackson was a predicate for the defense's theory that no one but Mrs. Jackson and the defendant, Cecil Jackson, was there at the time of the shooting, and that Mrs. Tyner had run down the steps before the shooting occurred and did not see the altercation that resulted in the killing of Houston Tyner. This, the jury apparently discredited and in our opinion they had good reason for so doing, particularly in view of the fact that this was in direct contradiction to the testimony of John Coy, night sergeant of police, corroborating Mrs. Tyner. He testified expressly Mrs. Tyner asked in his presence over the phone if the officers were there.

The record further discloses that the defendant and his wife admitted that they had drunk whisky about 5 or 5:30 p. m. Furthermore, Mrs. Jackson testified that Houston Tyner was drunk and had severely abused the defendant that night. This, the jury did not believe, or found in it no justification for Jackson's killing Tyner.

The defendant testified that another time, long before the night of the shooting as alleged in the information, Ty-

ner had abused him and threatened to disembowel him with a knife. In this he was corroborated by a former proprietor of the hotel, Ray Courtney, who said this happened while the defendant was convalescing from the rodeo injury. He said that Tyner was drunk at the time. He testified that Tyner, on that occasion, was angry because Jackson would not tell him that Tyner's wife was untrue to him while Tyner was away in the Navy.

As to the facts of the shooting, the defendant said that Tyner had abused him and hurt his pelvis. After Tyner left his room, the last time, Jackson said he decided to go to bed. He got his gun, put it in his pocket and started to the bathroom. When he reached the bathroom and started in, Houston Tyner, armed with a paring knife, grabbed him from behind, held him and tried to cut his throat with the knife; that they wrestled across the lobby and fell over some furniture with the defendant coming out on top. (Houston Tyner weighed about 190 pounds, was 28 years of age, was an Indian boy, whom the defense described as "strong" and "athletic." The defendant at the time of the shooting was 51 years of age and as he testified was suffering from the rodeo pelvis injury which had been re-injured in the scuffle with Tyner. Apparently, if the defendant's testimony is to be believed, Houston Tyner was able to throw him down on the floor and handle him with little difficulty, but at this particular moment, though he caught him from behind, he was unable to cope with the agility of the defendant.) When they fell, he finally got out his gun, he said, and was going to knock Tyner out. Tyner got hold of the gun and pulled it down between his legs, pulled back the hammer, and, the defendant's finger being against the trigger, the gun was discharged one time, he said.

At the preliminary hearing, the record shows that after Tyner left the room the defendant said he thought the situation over and decided to go to the Commercial Hotel and spend the rest of the night and that he got only as far as the bathroom when Tyner attacked him with the knife.

The defendant offered evidence to show that he had been cut with a knife, but the testimony proved conclusively that there was nothing more than a mere scratch on the abdomen. He further testified that Tyner knocked some teeth out but the testimony of reliable witnesses disproved this part of his story.

The record shows that as a result of this shooting escapade, Houston Tyner died on February 10, 1944, resulting from gunshot wounds inflicted upon him by defendant in a fight of February 6, 1944. The foregoing constitutes a substantial statement of the evidence upon which the jury found the defendant guilty of second degree manslaughter.

In addition to what has been said hereinbefore, this court has repeatedly held that it will not weigh conflicting and contradictory evidence which has been passed on by the jury. One of the most recent pronouncements of this rule is in Boulding v. State, 83 Okla. Cr. 352, 177 P. 2d 152, and Brown v. State, 81 Okla. Cr. 314, 164 P. 2d 401, wherein this court said: Where the evidence is circumstantial, though conflicting, this court will not reverse the same on the grounds of insufficiency. In this record, the evidence of Mrs. Tyner, the only known living, sober, witness, is quite substantial. Moreover, it is corroborated in many important details by officers of the law. Furthermore, the state's case is contradicted only by witnesses who admitted that they were drinking and one of whom, the defend-

ant, was described by the officers as being drunk. The other eyewitness on behalf of the defendant, Mamie Jackson, at one time in the evening, was on a crying drunk.

The record further discloses that the defendant, Cecil Jackson, admitted a former conviction by a plea of guilty of a felony of having transported a stolen car in interstate commerce. This admission carries with it, under the law, the implication of knowledge of the stolen character of the automobile and went to the defendant's credibility regardless of the defendant's full explanation, unobjected to by the state, seeking to absolve himself from guilt. Therefore, we are of the opinion that the contention of the defendant as to the insufficiency of the evidence is without merit.

The next proposition is that the court erred in admitting into the record unlawful and incompetent evidence, prejudicial to and preventive of the defendant having a fair trial.

In this connection, the defendant contends that evidence of social whisky drinking, commencing at about 5:30 or 6 p. m. and dancing thereafter, of the trip out to Grubb's Corner, of drinking beer, of the personal dispute or quarrel between the defendant, Jackson, and his wife at Razz's Cafe, and of what took place in the Jackson apartment, prior to the time when Tyner, allegedly, jumped on Jackson, was wholly incompetent and should have been excluded. In our opinion, this contention is unsound. All the things detailed, commencing with the whisky drinking in the Jackson apartment at 5:30 or 6 p. m., and continuing there and elsewhere, leading up to the shooting, throw light on the defendant's state of mind at the time of the shooting, and form a part of an unbroken chain of events leading up to and climaxing with the shooting of Houston Tyner by the defendant. This conclusion is sup-

ported by Phelps v. State, 64 Okla. Cr. 240, 78 P. 2d 1068. In syllabus three (3), this court said:

"Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing."

The evidence of this character was offered, for the purpose of and was clearly admissible, to show the defendant's state of mind prior to and at the time of the shooting. See, also, McCollum v. State, 57 Okla. Cr. 381, 48 P. 2d 872; Inman v. State, 22 Okla. Cr. 161, 210 P. 742; Tallon v. State, 22 Okla. Cr. 89, 210 P. 309.

The next contention of the defendant is that the court erred in excluding competent, relevant, and material evidence from the consideration of the jury.

First, he complains he was not permitted to show Tyner's reputation. As to this, the record discloses, defense counsel laid the predicate to show by the defendant, Tyner's reputation for being quarrelsome, but never did ask the defendant what that reputation was. As to the defendant's wife, Mamie Jackson, defense counsel did not lay the predicate for asking Mrs. Jackson about Tyner's reputation for being quarrelsome. However, the defendant was permitted to show by his witness, Courtney, that the reputation of Tyner was bad, particularly when he was drinking. As to this phase of the record, the defendant's complaint is obviously without merit.

Secondly, he complains that the court refused to permit Mrs. Jackson to testify why Mrs. Tyner, on a prior occasion, came into the Jackson room with her two boys and slept on a pallet at the foot of the Jackson bed. In this regard, he says, she would have testified "that Mrs. Tyner stayed in her apartment because she was afraid Mr. Ty-

ner would do her bodily harm and injury and she stayed in her apartment for protection".

Third, this contention is based upon the proposition that the court rejected testimony of Mr. and Mrs. Jackson in relation to threats and acts committed by the deceased, Houston Tyner, against his mother, sister, and his wife. In this connection, the defendant offered to prove that the testimony in this regard would show "that on one occasion her (Mrs. Tyner's) mother-in-law, the mother of Mr. Tyner, gave her a quilt, when Mr. Tyner was threatening her life (Mrs. Tyner's) and she went out in the cotton field and slept in order to keep Mr. Tyner from killing her; that Mary Lou Tyner told this witness that Mr. Tyner beat her up and beat his own mother nearly to death and beat his own sister and that Mr. Tyner was arrested and brought into Cushing and entered a plea of guilty and was fined on the charge." This testimony, as the basis for the last two contentions, was clearly inadmissible since the threats and the acts committed in no way were directed to the defendant and had no connection in any way whatsoever with the defendant or the issues of this case.

In Phelps v. State, supra, this court, 64 Okla. Cr. at page 248, 78 P. 2d, at page 1072, said:

"There is nothing in the record to show that this threat, if made, was directed to the defendant or Bill Downing, and was clearly inadmissible. The general rule is announced by Wharton on Homicide, 3d Ed., § 253, p. 415:

" 'Vague, indefinite threats of the deceased, not mentioning the accused, nor shown to have reference to him, are inadmissible in evidence in a prosecution for homicide upon the question of self-defense. *And threats made by the deceased against one person are not admissible in evidence*

*in a prosecution against another person for killing him.'*
Wireman v. Commonwealth, 206 Ky. 828, 268 S. W. 586."

There is a clear distinction between the excluded testimony in the case at bar, of threats against others, and the admitted testimony pertaining to the defendant's drinking and a quarrel with his own wife on the night of the shooting. The former had no direct or incidental relation to the defendant and the shooting and is clearly inadmissible, while the latter goes to the defendant's state of mind at a time not too remote, and is clearly admissible.

The defendant's next contention is that the court erred in its instructions. First, he complains that under the evidence the court erred in giving instructions on first and second degree manslaughter; that *the defendant was guilty of murder or nothing.* Then he says that since the court gave instructions covering manslaughter in the second degree, it should have included a definition of "culpable negligence."

It was the court's duty to instruct on every degree of homicide which the evidence in every reasonable view suggested. This court so said in Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981, 987, quoting from Kent v. State, 8 Okla. Cr. 188, 126 P. 1040, and Cannon v. Territory, 1 Okla. Cr. 600, 99 P. 622, as follows, to wit:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not."

This is a correct statement of the law. We think, because of the highly conflicting evidence, a reasonable view

thereof warranted an instruction of second degree manslaughter. But, the defendant contends that such an instruction containing only the language of the statute was too general and should have contained a definition of culpable negligence and that the court erred in not giving a definition thereof. The defendant made no request for an instruction defining culpable negligence. We are of the opinion that under the law it would have been better for the court to have included in its instruction a definition of culpable negligence. This conclusion is based upon the language of the statute, § 716, Title 21 O. S. A., which reads as follows, to wit:

"Manslaughter in the second degree.—Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree. R. L. 1910, § 2325."

The definition of culpable negligence should have been such as is contained in and approved by Kent v. State, supra [7 Okla. Cr. 692, 126 P. 1043], as follows:

"No. 10. Culpable negligence is the want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions, and you are instructed that a person handling a deadly weapon will be required under the law to use a higher degree of care and circumspection than if using an instrument ordinarily harmless."

However, we do not believe that the failure of the court to define culpable negligence, as a part of the instruction covering second degree manslaughter, constituted reversible error, in view of the record as a whole.

We think the evidence in this case tended strongly to prove the killing was premeditated and deliberate, and

amply sufficient to support a verdict of murder, especially when considered in light of the defendant's statement, "I am going to get my gun and kill him," referring to Tyner, less than half an hour before the shooting. Under the record, as herein made, the jury could have clearly reached a verdict of murder.

Likewise, when viewed as a killing in heat of passion, by means of a dangerous weapon, and not with a design to effect death and not amounting to excusable or justifiable homicide, the evidence is sufficient to support the verdict of first degree manslaughter. Or, while engaged in committing a misdemeanor by the pointing of a pistol at another, resulting in the death of Tyner, the evidence would have supported a verdict of first degree manslaughter. But fortunately for the defendant, the jury in an exercise of mercy or in a mistaken view of the law or the facts, found the defendant guilty of manslaughter in the second degree.

Moreover, we are bound by the provisions of § 916, O. S. A. Title 22, as follows:

*"Included offense or attempt may be found.* The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense. R. L. 1910, § 5923."

We are likewise bound by the decisions of this court construing that section. In Fisk v. State, 62 Okla. Cr. 305, at page 312, 71 P. 2d 499, 501, this court said:

"By numerous decisions of this court the rule is well settled that on a trial for murder, if the evidence demands a conviction of a higher degree of homicide, and does not warrant an acquittal, the defendant is not entitled to a new trial on the ground that, under the instructions so permitting, the jury found him guilty of a lower degree. Lytton v. State, 12 Okla. Cr. 204, 153 P. 620; Irby v. State,

18 Okla. Cr. 671, 197 P. 526; Harper v. State, 20 Okla. Cr. 43, 200 P. 879; Inman v. State, 22 Okla. Cr. 161, 210 P. 742; Calloway v. State, 38 Okla. Cr. 418, 262 P. 696."

In Berry v. State, 54 Okla. Cr. 154, 18 P. 2d 285, 286, this court said:

"Here the charge is murder; this charge includes a charge of manslaughter in the first and in the second degree."

See, also, Jenkins v. State, 57 Okla. Cr. 45, 45 P. 2d 161. In Inman v. State, supra, the defendant was charged with the crime of murder and convicted of manslaughter in the second degree. This court said, in that case, 22 Okla. Cr. at page 178, 210 P., at page 748:

"If any error was committed in finding defendant guilty only of manslaughter in the second degree, it was error of which defendant in this court will not be heard to complain. This doctrine is well established by a long list of authorities, among which are the following: Weatherholt v. State, 9 Okla. Cr. 161, 131 P. 185; Warren v. State, 6 Okla. Cr. 1, 115 P. 812, 34 L. R. A., N. S., 1121; * * * Smith v. State, 20 Okla. Cr. 301, 202 P. 519, 520; * * * Wilmoth v. State, 20 Okla. Cr. 453, 203 P. 1055, [21 A. L. R. 590]; Ballard v. State, 12 Okla. Cr. 277, 154 P. 1197."

In Wilmoth v. State, supra [20 Okla. Cr. 453, 203 P. 1057], it was said:

*"This court is committed to the doctrine that no prejudice can result to a defendant if convicted of a lower degree of homicide than warranted by the evidence."*

See, also, Tipton v. State, 23 Okla. Cr. 86, at page 93, 212 P. 612, 614, 31 A. L. R. 1074, wherein the court said:

"Where an offense is by statute divided into degrees, the jury may find the accused guilty of any offense the commission of which is necessarily included in that with which he is charged."

See, also, Seabolt v. State, 59 Okla. Cr. 1, at page 8, 57 P. 2d 278, 281; there this court said:

"The general rule is that in a prosecution for murder, when the court submits the issue and the jury finds a defendant guilty of first-degree manslaughter, although under the law and the facts the crime is murder, yet if the defendant is convicted of a lesser degree of homicide than that shown by the evidence, no prejudice could have resulted to him since the error is in his favor."

We therefore conclude that on this point no prejudice could have resulted to the defendant, under the state of this record, due to the fact that the defendant was convicted of a lessor degree of homicide than that supported by the evidence.

The defendant's final contention is that the court erred in its instruction covering a prior conviction. The objectionable part of this instruction is contained in the first 16 words thereof. The instruction in its entirety reads as follows:

*"You are instructed that however bad the defendant may be, or however guilty of other offenses,* the question for you to determine here is whether he is guilty of the offense charged, and whether that guilt has been shown beyond a reasonable doubt. No person should be convicted upon his reputation, character, or former convictions, but he can only be convicted upon the evidence in the case and the evidence must exclude any and every reasonable doubt of the guilt of the accused."

The first 16 words thereof, we believe, are erroneous since it leaves, by innuendo, the impression in the minds of the jury that the court felt the defendant was a bad person. We believe that it would have been much more appropriate for the court to have eliminated that portion of the instruction altogether. It was unnecessary and forms

no essential part of an instruction dealing with prior convictions. Otherwise, the instruction was a fair statement of the law. Though the first portion thereof was erroneous, we do not believe it is of such a character as to result in the miscarriage of justice or prejudice the defendant in any of his substantial rights. As to the error, if any, in the court's instruction, Cowley v. State, 65 Okla. Cr. 479, at page 487, 88 P. 2d 914, 918, clearly states the law applicable to this contention, wherein the court said:

"The court is firmly committed to the rule that an instruction improper and erroneous will not be held reversible error where it is manifest, on consideration of all the instructions given, the testimony in the case, and the verdict of the jury, that such an instruction did not work to the prejudice of the defendant, or deprive him of any substantial right."

See, also, Jones v. State, 20 Okla. Cr. 154, 201 P. 664; Fowler v. State, 8 Okla. Cr. 130, 126 P. 831; Needham v. State, 55 Okla. Cr. 430, 32 P. 2d 92; Cadwell v. State, 54 Okla. Cr. 2, 13 P. 2d 214; Roddy v. State, 47 Okla. Cr. 283, 287 P. 765; Calloway v. State, 38 Okla. Cr. 418, 262 P. 696; Fulkerson v. State, 17 Okla. Cr. 103, 189 P. 1092; Wilson v. State, 17 Okla. Cr. 47, 183 P. 613; Baker v. State, 65 Okla. Cr. 136, 83 P. 2d 586; Rickman v. State, 70 Okla. Cr. 355, 106 P. 2d 280; Glenn v. State, 72 Okla. Cr. 165, 114 P. 2d 192, 158 A. L. R. 1146.

The errors complained of in this case fall within the provisions of § 1068, Title 22 O. S. A., as follows, to wit:

*"Harmless error*

"No judgment shall be set aside or new trial granted by any appellate court of this State in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opin-

ion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right. R. L. 1910, § 6005."

We have carefully examined the entire record, the evidence, and the instructions, as a whole, and are of the opinion that the defendant was not deprived of any substantial rights. See, in this connection, the cases cited under the rule announced in Cowley v. State, supra.

Finding no substantial prejudice to the rights of the defendant herein and for all the foregoing reasons, the judgment and sentence imposed herein is affirmed.

BAREFOOT, P. J., and JONES, J., concur.