## N. C. DRENNAN v. STATE.

No. A-9644.  May 23, 1940.
(102 P. 2d 952.)

Hatcher & Bond, of Chickasha, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. The information in this case in substance charged that in Grady county, on or about the 9th day of January, 1938, N. C. Drennan did burglariously and feloniously break and enter by opening the front screen door and unlocking the front door with a key a certain store building, located in the town of Alex, and in the possession of R. Q. Prim, in which certain personal property was kept, with the unlawful and felonious intent on the part of him, the said N. C. Drennan, to take, steal and carry away, without the knowledge or consent of the owner, certain personal property therein, to-wit, money and merchandise, and to convert the same to the use and benefit of him, the said N. C. Drennan.

The trial resulted in a verdict of guilty of burglary in the second degree as charged in the information, and fixing his punishment at confinement in the penitentiary for two years.

Motion for new trail was duly filed, and on November 7, 1938, was overruled; thereupon the court rendered judgment in accordance with the verdict.

An appeal was perfected by filing in this court on May 4, 1939, a petition in error with case-made.

The only assignments of error argued in the brief are that the verdict is contrary to law and to the evidence, and that the court erred in refusing to instruct the jury to acquit the defendant.

It is contended by the defendant's counsel in an elaborate argument that the court erred in overruling the demurrer to the evidence at the close of the state's case.

It appears from the evidence that the defendant, Drennan, was appointed town marshal of the town of Alex, about the 1st of March, 1934, and that he continued as such officer until January 12, 1938; that it was customary for the town marshal to also be night watchman, and he was selected by the merchants as night watchman, The complaining witness, R. Q. Prim, was a merchant, in the grocery business at Alex, and had been in such business about ten years. His store was on Main street.

Prim testified that for some weeks prior to the 9th day of January, 1938, he had been missing change in his store, and had been checking up short; that he kept his cash in a drawer of a National Cash Register; that he checked his cash every night and kept a record of it. That from December 13, 1937, he found almost daily a shortage; the days the shortage was above a dollar were December 13th, $1.35; 14th, $2.20; 16th $3.62; 21st, $1.54; 23rd, $2.20; 29th $2.07; 30th, $2.95; and December 31st, $4.52, short. January 3, $1.46; January 4th, $1.21; January 5th, $2.90; and January 7th, $3.83. Six or seven days between the above dates, the amount ranged from 5 to 50 cents short.

On Saturday morning, January 8th, he found a nickel can of sardines lying on the floor a long ways from where it belonged on the shelf. That he concluded that some one was entering his store at night and taking this money,

and he decided to arm himself and come back to the store and hide in the back of the building and wait and watch. He asked his clerk, Willie Buchanan, to come with him; both being armed, he with a shotgun and his clerk with a pistol. He closed the store that night at 8 o'clock and locked the front door, and they came back to the store between 9 and 10 o'clock. There was a light burning in the store; that about 2 o'clock he heard some one open the screen door, insert a key, turn the lock, press down on the latch and push the door open; some one came in and made some steps in the direction of the counter where the cash register was; that he recognized the defendant and hollered: "Stop N. C." That Drennan took several steps forward, and he then reached for his gun and he said: "N. C., don't pull that gun." Drennan said "Who is that?" And he said "It is Prim."

On cross-examination he stated that Drennan said that he had seen some one around the front door and had come over to investigate and found the key in the lock and came in to check up and suggested that they go and catch him; that he declined to go and told Drennan to go if he wanted to; that Drennan went out and directly came back and took the key out of the front door and gave it to him. He produced the key and it was offered in evidence; that he did not know what happened to the door from the time he left the store until he returned that night.

Willie Buchanan testified that he had worked about 5 years as a clerk in Mr. Prim's store in Alex, was with Mr. Prim in the store that night, armed with a 38 Colts pistol, Mr. Prim had an automatic shotgun, and they were in the back end of the store; that along about 2 o'clock in the morning some one came to the front dor, he heard the screen door open, heard him unlock the door,

mash down the latch and walk in. He started down the aisle and was moving fast in the direction of the cash register, and was about eight feet from it when Mr. Prim rose up and hollered, "Stop, N. C." He asked, "Who is that?" Mr. Prim said, "It is Prim." Drennan dropped his hand and said, "There is something wrong."

On cross-examination he stated that he recognized Drennan when he stepped in. Mr. Prim had his automatic shotgun on him when he spoke to him.

The state rested, and counsel for the defendant moved the court to direct the jury to return a verdict of not guilty, for the reason that the proof was not sufficient to show that the offense charged in the information has been committed. Motion overruled and exception allowed.

The defendant, Drennan, as a witness in his own behalf testified that he was town marshal of the town of Alex from March 1934, until January 12, 1938; that he held two positions, town marshal and night watchman; the town paid his salary as town marshal and the merchants paid him as night watchman; that his duties as night watchman were to go around and shake the store doors after the merchants had closed up to see if any were left open; that he tried to make the rounds every hour or two, but when the store was lighted he did not shake the doors so often, maybe once or twice a night. On the night of January 8th, he was at Lester Shaw's barber shop, located in the middle of the block on the same side as Prim's store, and he walked across the street and shook Mr. Robinson's front door, and walked around through a gap and shook the back door, and walked around, shook other doors, and came to Sander's filling station on the corner, then walked straight across to Mr. Prim's store; a light was burning in the store; that he pulled the screen

door open, reached down and started to shake the door and it opened and he stepped in; that he had shaken the door one time before, early in the night, at that time it was locked; that he started down the runway in the store; someone said, "Stop there," and he said, "Who is that?" He said "It is Prim." That he walked from behind the counter at the end opening. Mr. Prim held a shotgun on him, and said, "N. C., what are you doing in here?" He said "Your front door was open." Prim said, "Don't reach for your gun, let's don't have any shooting scrape," and he said, "Mr. Prim, what is going on here?" Prim said, "Go on out." He said, "Well, let's get out here and see what is going on, there was a fellow just passed down the street here." Mr. Prim said: "No, that was all right, or something to that effect," and said "Go on out." He had a shotgun on him and he walked out of the store; that he walked around the corner and decided he would go back and see what was wrong, so he walked back and pulled the screen open and swung the door open, and noticed a key in the door; it was the first time he noticed the key. He opened the door and said, "Mr. Prim, is this your key in the door?" Prim said, "No." He pulled the key out and walked back to where Mr. Prim and his clerk were standing and handed him the key. Mr. Prim said, "That is not my key." He said: "If this is not your key, we had better call the sheriff's force and have them send five or six cars down here and get out on each of the roads and maybe we can pick up somebody." Mr. Prim said, "No, there was no use to call the sheriff's office," and they all walked out of the store.

He also testified that he had no intention of stealing anything out of Prim's store.

On cross-examination he was asked:

"Q. Why were you going in and going behind that counter, what business did you have in there? A. I was investigating. Q. Did you take your gun out as you went in the door? A. Not at that time."

The main contention on the part of the defendant is that the evidence is insufficient to show that he broke and entered the store with intent to steal therein.

In the instant case the information charges the burglarious entry of a certain store building with intent to commit larceny, and the intent to steal was an essential element of the crime charged.

There was no denial that the defendant opened both the screen door and the front door and entered the store. The testimony of the two witnesses for the state was that he opened the screen door and unlocked the front door, lifted the latch, pushed the door open and entered and walked towards the counter where the cash register was when the owner called upon him to stop. The defendant's explanation was that in performing his duties as night watchman he found the store door unlocked and entered the store to make an investigation. The only issue in the case was: With what intent did the defendant enter the store?

Whether or not the defendant unlocked the door and entered the store, or found the door open and entered the store, was a question of fact for the jury to determine. When it is shown that a defendant broke and entered a store in the nighttime, it may ordinarily be presumed that he did so with intent to commit larceny, though at the time he was detected he had not appropriated any property, and the question of intent is for the jury, to be gathered from the circumstances attending the entry, and prior and subsequent thereto. 9 Am. Jur., Burglary,

§ 61; State v. Woodruff, 208 Iowa, 236, 225 N. W. 254; Annotation, Ann. Cas. 1913C, 519.

There are facts and circumstances established by undisputed testimony in the case. It was shown that for about three weeks prior to the date alleged the owner had been missing change taken from the cash register when he checked his cash in the morning, which caused him to lay in wait with his clerk in the store in order that he might detect the offender.

It is only where there is a total failure of substantial evidence of the elements, or some one element, of an offense that this court on appeal is permitted to reverse a conviction on the ground that the evidence is insufficient to sustain it. The jury is the exclusive judge of the weight of the evidence and credit to be given to the witnesses. Where there is a direct conflict in the evidence, or it is such that different inferences may be properly drawn from it, the jury's determination will not be interfered with upon the ground that the evidence is insufficient to sustain a conviction to prove each element of the offense charged.

It follows from the foregoing review that there is evidence in the record sufficient to authorize the jury to find the defendant guilty as charged. The jury evidently did not believe the explanation of the defendant as to why he entered the store.

The instructions of the court, to which no objection was made or exception taken, fairly covered the law of the case, and were as favorable to the defendant as he could have demanded.

No other reason for a reversal of the judgment being urged, and no material error appearing in the record, the judgment appealed from is affirmed.

BAREFOOT and JONES, JJ., concur.