STATE, Appellant, v. KENNEDY, Respondent.
SAME, Appellant, v. REYNOLDS, Respondent.
SAME, Appellant, v. STRONG, Respondent.

*January 12—February 6, 1962.*

601

For the appellant the cause was argued by *William A. Platz,* assistant attorney general, and *John Peyton,* district attorney of Racine county, with whom on the briefs was *John W. Reynolds,* attorney general.

For the respondents there was a brief and oral argument by *Charles M. Constantine* of Racine, for Leo Francis Kennedy and Paul Lloyd Reynolds, and by *Manny S. Brown* of Racine, for Allan Ward Strong.

FAIRCHILD, J.    1. *Unauthorized entry of a public building may be burglary under present statutes.* The question which is common to all three appeals is whether entry of a "public building" (presumably a building owned or used by a public body) is an offense under sec. 943.10, Stats., where the prescribed unlawful intent is present and consent of the person in possession is lacking.[1] Defendants contend, and the municipal court decided, that it is not.

---

[1] "943.10 BURGLARY. (1) Whoever intentionally enters any of the following places without the consent of the person in lawful possession and with intent to steal or commit a felony therein may be imprisoned not more than ten years:

"(a) Any building or dwelling; or

"(b) An inclosed railroad car; or

"(c) An inclosed portion of any ship or vessel; or

"(d) A locked inclosed cargo portion of a truck or trailer; or

"(e) A room within any of the above.

"(2) Whoever violates sub. (1) under any of the following circumstances may be imprisoned not more than twenty years:

We can find no suggestion in the context of sec. 943.10, Stats., that the words "any building" are restricted in meaning so as to exclude public buildings or any other class of building. Sub. (3) makes it evident that the legislature contemplated that the places listed in sub. (1) include at least some places which are open at times to the general public. There is no room for the application of the rule of *ejusdem generis* or *noscitur a sociis* so as to restrict the meaning of the word "building" in the enumeration in sub. (1).

The only theory upon which a public building can be excluded from the meaning of "any building" is that "building" must carry with it the same meaning it had in the series of words "any office, shop, or warehouse, or any other building" in sec. 4409, R. S. 1878, interpreted in *Howard v. State* [2] and retained as late as sec. 343.11, Stats. 1953, prior to the enactment of the present Criminal Code.

It is true that this court in *Howard* held that when the legislature added "or any other building" after "warehouse" in the revision of 1878, the words added did not include all buildings and were not intended to include a schoolhouse or other building erected or employed for public use. The statutory context in 1878 and in the Revised Statutes of 1898 at the time of the *Howard* decision was so different from the Criminal Code that we find the *Howard* interpretation an insufficient reason to restrict the apparently inclusive

"(a) While armed with a dangerous weapon; or
"(b) While unarmed, but arms himself with a dangerous weapon while still in the burglarized inclosure; or
"(c) While in the burglarized inclosure opens, or attempts to open, any depository by use of an explosive; or
"(d) While in the burglarized inclosure commits a battery upon a person lawfully therein.
"(3) For the purpose of this section, entry into a place during the time when it is open to the general public is with consent."
[2] (1909), 139 Wis. 529, 121 N. W. 133.

term "any building" in the present sec. 943.10 (1) (a), Stats.

In the statutes of 1898 there were four different sections punishing burglary: Breaking and entering an occupied dwelling house in the nighttime with intent to commit a felony, the offender being armed or assaulting an occupant, was punishable by five to fifteen years' imprisonment (sec. 4407, Stats.); the same offense except the offender not being armed nor making an assault and whether the dwelling was occupied or not was punishable by three to eight years' imprisonment (sec. 4408). As pointed out in *Howard,* burglary at common law had been confined to dwellings as in secs. 4407 and 4408. Secs. 4409 and 4410 were said to represent recent extensions of the offense of burglary. Breaking and entering in the nighttime with intent to commit a felony was punishable under sec. 4409 by one to five years' imprisonment. The places involved were "any office, shop, or warehouse, *or any other building* not adjoining or occupied with any dwelling house, or any ship, steamboat, vessel, *railroad freight car, or passenger car.*" The italicized words were added to the section in 1878. Entering in the nighttime without breaking, or breaking and entering in the daytime was punishable under sec. 4410 by one to three years' imprisonment in state prison or six months to one year in jail. The places involved were "any dwelling house or any outhouse thereto adjoining and occupied therewith, or any office, shop, or warehouse *or other building,* or any ship, steamboat, or vessel, *railroad freight car, or passenger car.*" The italicized words were added in 1878.

Another section, 4412, Stats., under the heading "larceny" prescribed punishment for breaking and entering at any time "any meetinghouse, church, courthouse, town house, college, academy, or other building erected and employed for

public use" and stealing therein the money or property of another, and also for "larceny in any dwelling house, office, shop, bank, warehouse, *or other building,* ship, steamboat, vessel, *railroad freight car, or passenger car."* The italicized words were added in 1878.

This court in *Howard* reasoned from the common law and the history of the legislation that the burglary sections were concerned with offenses against habitation and ownership of private property. It pointed out that buildings devoted to public uses were not specifically mentioned in the sections dealing with burglary, but that sec. 4412, Stats., did specifically provide a penalty for breaking, entering, and stealing in public buildings. It reasoned that sec. 4412 tended to show that breaking and entering a public building was not included under the sections pertaining to burglary. The court might well have also applied the rule of *ejusdem generis* to limit the meaning of the general term "or any other building" appearing at the end of a series of buildings connoting private property.

Sec. 943.10, Stats., as found in the present Criminal Code does not permit the same reasoning. Burglary of a dwelling is no longer treated as a more-serious offense than burglary of any other of the enumerated places. Burglary committed while the offender is armed or commits a battery upon an occupant permits imposition of a greater penalty, but this is true without distinction as to the type of place entered. There is no longer any other section specifically providing a penalty for breaking and entering or unauthorized entry of a public building. As previously pointed out, there is no room for restriction on the meaning of the words through the application of *ejusdem generis.*

Defendants argue that the Criminal Code was not generally intended to make substantive changes in the law. There may well be provisions of the present Criminal Code

which appear to be but a restatement of previous statutes as interpreted by court decisions, and where such apparent purpose should be a guide to interpretation, or where it is evident that a particular word or phrase was used in the same peculiar sense in which it had been used previously. It is apparent, however, that a number of substantive changes have been effected in replacing secs. 343.09, 343.10, 343.11, 343.12, and others of the 1953 statutes (the first enumerated corresponding generally with secs. 4407, 4408, 4409, and 4410, R. S. 1898) with sec. 943.10, Stats. Penalties have been changed and many of the former distinctions erased. We find no reason to restrict the word "building" as used in sec. 943.10 (1) (a) to less than its ordinary meaning.

Accordingly, it was error to rule that the statute was not applicable to entry of public buildings. In the *Reynolds* and *Strong Cases* the dismissals were based solely on this ruling, and there is no challenge to the state's right to appeal under sec. 958.12 (1) (a), Stats., from these orders made before jeopardy has attached. Accordingly the orders in the *Reynolds* and *Strong Cases* are reversed.

2. *Kennedy's motion to dismiss state's appeal.* The propriety of our consideration of the merits of the state's appeal from the judgment acquitting Kennedy is challenged by a motion to dismiss. His counsel argues that to permit the state to appeal from such a judgment exposes Kennedy to unconstitutional second jeopardy.

Sec. 958.12 (1) (d), Stats., provides:

"(1) A writ of error or appeal may be taken by the state from any:

"(d) Judgment adverse to the state, upon questions of law arising upon the trial, with the permission of the trial judge, in the same manner and with the same effect as if taken by the defendant. A judgment acquitting the defendant of all or part of the charge shall be deemed adverse to the state."

In *State v. Witte* [3] the trial court set aside a verdict of guilty for the reason that the evidence was insufficient, and discharged the defendant. The state obtained a writ of error under sec. 358.12 (8), Stats. 1941. Defendant contended that sec. 358.12 (8) (substantially similar to the present sec. 958.12 (1) (d)) violated sec. 8, art. I of the Wisconsin constitution which provides: ". . . no person for the same offense shall be put twice in jeopardy of punishment." The court decided to the contrary, saying at page 430:

"All of this points to the end that there shall be but one legal trial, but it is not straining the commonly called double-jeopardy provision of the constitution to say that it is a single and continuing jeopardy until such time as a defendant has had a legal trial for the offense with which he is charged. To say that a defendant has been twice placed in jeopardy because he is required to stand a second trial when the first trial was not according to the law of the jurisdiction in which he was tried is contrary to sound reasoning."

In *State v. Nall* [4] this court held that a trial court's ruling after verdict of guilty that the evidence was insufficient to sustain it was a ruling upon a question of fact, not law, and therefore not reviewable under the terms of sec. 358.12 (8), Stats. Although this decision was not mentioned in *State v. Evjue* [5] decided later, the reasoning is inconsistent with the reasoning in both the *Witte* and *Evjue Cases* and we expressly overrule it.

In *State v. Evjue, supra,* footnote 5, the state had obtained a writ of error to review a judgment of acquittal in a case where the trial had been to the court. This court construed the record as showing that the judgment was based upon a finding of not guilty by the court as trier of the fact rather than upon a ruling of law that the evidence was in-

---

[3] (1943), 243 Wis. 423, 10 N. W. (2d) 117.
[4] (1946), 248 Wis. 584, 22 N. W. (2d) 520.
[5] (1949), 254 Wis. 581, 37 N. W. (2d) 50.

sufficient to raise an issue for consideration by the trier of fact. Upon that construction this court concluded that it had no power to review the merits of acquittal or to reverse the judgment. It stated, however, after discussing the *Witte* and other decisions, that if a trial court determines that the evidence is insufficient to support a finding of guilt and consequently declines either to consider the case on its merits or submit it to a jury, those rulings are reviewable because the court is acting not as the ultimate tribunal deciding the case upon its merits, but as a trial court deciding procedural questions. This court stated, at page 589:

"The trial court in these two cases did nothing more than to discharge the inherent judicial function of appraising the evidence and dismissing the case where there was either no evidence of guilt at all or where the evidence would not sustain a jury's verdict. This situation is to be distinguished from one in which, upon all the evidence admitted, the trial court or the jury has considered the case upon its merits and has found defendant not guilty. It is the function of the trial court in a lawsuit, whether civil or criminal, to appraise the evidence at various intervals during the trial for the purpose of ascertaining whether it is sufficient to warrant submission to and consideration by the tribunal. Since there can be no direction of a verdict against defendant in a criminal case the trial court can direct a verdict only against the state. While there is much authority to the effect that such a direction terminates jeopardy as much as a jury's verdict, we think that is not true under the doctrine of the *Witte Case* and the subsequent Wisconsin cases, provided the continuity of the case is preserved by an appeal. Where the court exercises its function of determining that the evidence is not sufficient to submit to a jury it exercises a judicial function which is subject to review under sec. 358.12 (8), and this is true whether it dismisses the case or directs a verdict against the state. While it can be asserted with considerable force that the exercise of this function frequently involves determinations of issues of fact, courts generally consider that it constitutes the determination of questions of law.

Indeed, *State v. Witte, supra,* in which the trial court set aside the verdict of guilty as unsupported by the evidence is an example of this."

We find no infirmity in the theory that where the continuity of the proceedings is preserved by timely motions and appeals, subjecting the defendant to a second trial by reason of errors in the first trial is not placing him in new and second jeopardy, nor in the reasoning that the ruling of a court upon the sufficiency of evidence to go to the jury or sustain a verdict is a ruling upon a question of law reviewable upon the state's appeal from a judgment of acquittal, with the permission of the trial judge.

3. *Sufficiency of evidence.* Having concluded that the state's appeal from the judgment acquitting Kennedy is properly before us and that the offense charged could have been committed by entry into a public school building, we reach the question whether the evidence would sustain a verdict of guilty. Kennedy's counsel concedes that although the evidence is circumstantial it could support a finding that he entered and was in the Waller school shortly before his arrest. The issue is whether there was evidence that when he entered the building he had the intent to steal therein.

Review of this question requires a detailed statement of the facts.

On Saturday evening, October 29, 1960, at about 10 o'clock two police officers of the city of Burlington checked the Waller graded school. The building appears from photographs to be a fairly new brick building. It is 150 to 175 yards long. About 625 children attend. At the front, toward the north, and partly along the west side, the upper floor is at ground level. The ground slopes so that on the south end and east side the lower floor is at ground level. One doorway is located on the east side near the south end. There the officers found that one door bulged a little from

the casing. The door is largely of glass, with a metal frame. There were a number of diagonal cracks in the upper portion of the glass, and there were marks on the metal jamb next to the side of the door which swings outward. The officers were unable to open it, and believed that it was locked. There was testimony describing the door as having been jimmied. The same door had been checked the night before and found secure. Other doors were found to be secure on the night of the 29th. They were of a type which can be opened from the inside by a push bar.

One of the officers called the police office so that the chief could be notified. Officer Cable went to the north toward the front of the school. The doors at the front are near the northeasterly corner, set in an entranceway, and recessed about 20 feet. Cable used his flashlight to look there, tried the doors, found them locked, and saw no one.

Cable walked 75 to 100 feet out from the front of the school to a light pole near the street. He stood in a shadow, watching the school. There was lighting around the school from under the overhanging roof. Shortly after he reached the light pole, and about five minutes after the first discovery of the bulging door, the chief of police drove by in his car and headed south toward the back of the school. About 45 seconds later, Cable "noticed three fellows come charging out of the front entranceway." They were about 20 feet from the doorway when he first saw them, were running very fast, and when a little ways out from the building, ran in different directions. He shouted to stop or he would shoot. The three, Kennedy, Reynolds, and Strong, did stop, and Strong dropped a canvas bag he had been carrying.

There was no testimony as to the ages of the men, although they were at times referred to on the trial as "men" or "fellows." There was no testimony as to whether they were

local residents or strangers except that Officer Cable testified he had never seen any of them. Burlington had a population of 5,856 in 1960.

The canvas bag, which is a type ordinarily used for travel, contained tools which were referred to in the testimony as a hammer, maul, two drive pins, and a chisel. There was no other testimony concerning them. The hammer has a double-faced steel head and a handle of ordinary length. The head of the maul is quite heavy, but the handle is about the same length as that of the hammer. The steel chisel appears to be seven or eight inches long. One of the pins is tapered and about an inch longer than the chisel. The other is tapered, pointed, and about twice as long as the chisel. Although there is no testimony describing the manner in which such a combination of tools could be used, it is clear from inspection that they would be effective in opening many types of locked receptacles.

All the men wore jersey gloves, although the weather was mild.

A search of the school disclosed nothing unusual except two crowbars or pinch bars found on a boot shelf in the upper hall at the south end of the school. The janitor testified that they did not belong to the school. The district attorney apparently hoped to prove that the marks on the doorjamb were made by these bars and attempted to prove the qualifications of the chief to testify as an expert on that subject. The court ruled, however, that sufficient qualifications were not established.

The attorney general argues:

"It is a reasonable inference which the jury could draw to a moral certainty that the defendants unlawfully entered the building but before they were able to accomplish their larcenous purpose they were surprised by the arrival of the police and attempted to escape at their first opportunity.

"In this case, therefore, the presumption or inference of an intent to steal arises from the unlawful entry in the night-

time and is corroborated by the further circumstances that the defendants wore jersey gloves, had burglarious tools, attempted to flee, and gave no lawful explanation for their presence."

Defendant Kennedy, after conceding that the record could support a finding that he entered the school, asks:

"But why was the defendant in the Waller school? Did he intend to steal . . . [the children's rubbers, shoes, and sweaters] ? Or did he intend to commit some misdemeanor other than theft, such as destroying property having a value of less than $1,000? Or did he have some other, completely innocent intent? We search the record in vain for answers to these questions."

This court has recently said:[6]

"The type of reasonable certitude required in criminal cases is moral certainty relating to the affairs of human conduct and grows out of informed experience with the common ways (mores) of man. It is based upon the certain constancy and uniformity in the free conduct of humans under given conditions or motives. Based upon long experience with the actions and motives of human nature, certain inferences of conduct may be drawn from various circumstances to a moral certainty. This is not to say that exceptions and possibilities may not exist but such possibilities in themselves do not prevent a person from forming a reasonable conviction beyond a reasonable doubt or to a moral certainty of the truth of a fact. This degree of certainty required to sustain a criminal conviction may be attained upon circumstantial evidence as well as upon direct evidence."

A number of authorities support the proposition that the fact of breaking and entering in the nighttime is evidence from which it may be presumed or inferred that it was done with intent to steal, although it is also true that in many, but not all, the statement is made with reference to dwelling

[6] *State v. Johnson* (1960), 11 Wis. (2d) 130, 136, 104 N. W. (2d) 379.

houses or places where the keeping of valuable things is more to be anticipated than in a school, even a modern one of substantial size.

"Intent, being a state of mind, is rarely susceptible of direct proof, but ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them which reasonably indicate them to the mind of others. . . . It has been said . . . that the very fact of a man's breaking and entering a dwelling house in the night-time is strong presumptive evidence that he did so with the intent to steal." [7]

"The most-usual intent is to steal, and when there is no explanation or evidence of a different intent, the ordinary mind will infer this also." [8]

These and other authorities support the proposition that intent to steal can be inferred from breaking and entering at night into a dwelling,[9] a store,[10] a business office,[11] or a school.[12]

The majority of this court, Mr. Justice BROWN, Mr. Justice HALLOWS, Mr. Justice DIETERICH, and Mr. Justice GORDON, are of the opinion that the inference of intent to steal could not properly be drawn from the evidence with sufficient certainty to overcome the presumption of innocence and to meet the standard of proof beyond a reasonable doubt. It follows that the judgment of acquittal is to be affirmed.

---

[7] 9 Am. Jur., Burglary, p. 271, sec. 61.

[8] *State v. McBryde* (1887), 97 N. C. 393, 396, 1 S. E. 925.

[9] *Steadman v. State* (1888), 81 Ga. 736, 8 S. E. 420; *Vickery v. State* (1911), 62 Tex. Crim. 311, 137 S. W. 687; *State v. Woodruff* (1929), 208 Iowa 236, 225 N. W. 254; *Ex parte Seyfried* (1953), 74 Idaho 467, 264 Pac. (2d) 685; *Burrows v. State* (1882), 84 Ind. 529; *Commonwealth v. Ronchetti* (1955), 333 Mass. 78, 128 N. E. (2d) 334.

[10] *Drennan v. State* (1940), 69 Okla. Crim. 348, 102 Pac. (2d) 952.

[11] *Commonwealth v. Eppich* (Mass. 1961), 174 N. E. (2d) 31.

[12] *People v. Nichols* (Cal. D. C. App. 1961), 16 Cal. Rep. 328, 330.

The opposite view is held by Mr. Chief Justice BROADFOOT, Mr. Justice CURRIE, and the writer of this opinion.

*By the Court.*—The orders dismissing the actions in *State v. Reynolds* and *State v. Strong* are reversed, and the causes remanded for further proceedings. In *State v. Kennedy* the motion to dismiss the appeal is denied and the judgment affirmed.