STATE, Respondent, v. HARRIS, Appellant.

*No. State 82.   Argued September 9, 1968.—Decided October 1, 1968.*
(Also reported in 161 N. W. 2d 385.)

202

For the appellant there was a brief and oral argument by *Robert T. McGraw* of Waukesha.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, *William A. Platz,* assistant attorney general, and *Roger P. Murphy,* district attorney of Waukesha county.

HEFFERNAN, J.

*Was the evidence, if believed and rationally considered, sufficient to prove the defendant's guilt beyond a reasonable doubt*

In a criminal case, the test of the sufficiency of the evidence is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101; *State v. Waters* (1965), 28 Wis. 2d 148, 153, 135 N. W. 2d 768; *Jensen v. State* (1967), 36 Wis. 2d 598, 607, 153 N. W. 2d 566, 154 N. W. 2d 769. An

analysis of the evidence clearly leads to the conclusion that the jury could properly have found the defendant guilty beyond a reasonable doubt.

Both Reverend Andersen and Eric Andersen testified that the man they saw in the church was the same man that they later identified in a police lineup and as the defendant in this case. Reverend Andersen stated that he talked to the man for almost fifteen minutes, during which time the interior of the church was brilliantly lighted. Reverend Andersen testified that he observed this man from a distance of only one or two feet. His son Eric testified that he observed the man at a greater distance but within five or six feet.

Prior to the police lineup, the picture of a suspect was brought to Reverend Andersen, and he tentatively identified the picture as being that of the man in the church. His identification was unequivocal at the lineup and in court.

Eric, without hesitation, identified the defendant as the man in the church at a later lineup, although he had not been shown the photographs of the suspect Harris prior thereto.

Other corroborating identification evidence was also put forth at the trial. Both of the Andersens testified that the burglar wore shoes with Cuban heels, and the testimony of the police showed that the footprints of the burglar in the snow showed Cuban heels. Harris was wearing that type of shoe at the time he was arrested.

The conversation between Reverend Andersen and the burglar is also significant in corroborating the identification. Andersen stated that when he saw the man, he looked familiar to him, but he was unable to place his prior contact with him. After Reverend Andersen learned the defendant's name, he remembered that the

man had been at his parsonage on at least two occasions, the latest being only three weeks before the burglary, asking for assistance. On Harris' visit to the parsonage in December, he had asked that Reverend Andersen write a letter of encouragement to the defendant's wife, who was hospitalized in Florida. The prior contact with Reverend Andersen was admitted on trial by the defendant. When the man in the church was accosted by Reverend Andersen, he said, "I know you know who I am . . . . My wife is in the hospital and she needs money."

These eyewitness identifications are highly probative of the defendant's guilt. However, the defendant attacks the credibility of the identification in two respects. His first attack is upon the procedure used by the police in displaying a photograph to Reverend Andersen prior to the lineup.

It is undisputed that two days after the burglary, detectives came to the church and showed two photographs to Reverend Andersen and asked whether either of them was the burglar. Reverend Andersen stated that he made a tentative identification of the photograph labeled with the name of Michael Harris as being that of the burglar. He also admitted that when he saw the name, he remembered his prior contact with Harris. He, however, reserved any positive identification until he could see the defendant personally. Either that day or a day later, the pastor was advised that Harris would be in a lineup and that he would be asked to pick him out from four other persons. At the lineup the name and number of the individuals therein was given. The name Michael Harris was the only name familiar to Reverend Andersen. He thereafter identified Harris in the lineup as the man in the church.

The claim of the defendant is that the recollection that Harris was the burglar was erroneously induced by the display of his picture and the revealing of his name prior to the lineup and that a faulty recollection was aided by the suggestions of the sheriff's department and, hence, the identification is incredible.

We agree with the defendant's contention that the procedure used was not the optimum one and that an erroneous identification could conceivably have been suggested by the method used. We have, however, disposed of a similar claim in *Brown v. State* (1965), 28 Wis. 2d 383, 388, 137 N. W. 2d 53, in which we said:

"This record does not support the claim that the witnesses were shown photographs of Brown in such a manner 'that the witnesses were given the impression that this was the man who had committed the holdup even though they had not yet identified him in the lineup.' In any event, it would be within the province of the trier of the fact to determine what effect the display of a defendant's photograph to witnesses prior to their identification of him has on the weight and credibility of their subsequent identification. We find nothing in the testmony with respect to pictures of Brown that would render the witnesses' positive identification incredible as a matter of law, or insufficient to convince beyond a reasonable doubt." *Accord, State v. Clarke* (1967), 36 Wis. 2d 263, 153 N. W. 2d 61.

Moreover, it should be remembered that, although Eric Andersen had possibly seen Harris at the parsonage, he was not shown any photographs prior to his identification of Harris in the lineup, nor was he informed as to which of the men in the lineup was Michael J. Harris. Yet, his identification at the lineup, at the preliminary examination, and at the trial was unequivocal.

The second objection to the credibility of the identification evidence is based on the undisputed fact that the

defendant at the time of the burglary had a small but clearly visible scar above the left eyebrow. Yet, Reverend Andersen failed to mention such scar when describing the burglar to the representatives of the sheriff's office. In the course of trial, both Eric and his father were frank to admit that they did not notice the scar. The jury had before it pictures taken immediately after the defendant's arrest, which show the scar and from which they could have concluded that it was not a particularly distinguishing mark. The fact that the defendant did bear a visible scar which neither Reverend Andersen nor his son mentioned initially, of course, does go to the credibility of their testimony; but whether their testimony should be discounted for that reason was a matter for the jury to determine. A similar question was before us in *State v. Clarke* (1967), 36 Wis. 2d 263, 273, 153 N. W. 2d 61, in which we stated:

"This is a matter of credibility, and the jury may have considered the scars as not prominent or may have considered her testimony together with that of Mr. Traas as overwhelming evidence that defendant was the assailant or may simply have noted the inconsistency without considering it substantial enough to raise a reasonable doubt of defendant's guilt, perhaps because of prosecutrix's state of mind during the attack. The credibility of witnesses is peculiarly for the trier of fact to determine . . . . It cannot be said here that prosecutrix's failure to notice defendant's scars must necessarily raise a reasonable doubt in the mind of the jury."

We conclude that neither of the defendant's objections warrant the conclusion of this court that the identification testimony was incredible as a matter of law. At best, this conflicting testimony creates factual discrepancies, which go merely to the determination of the trier of fact as to whether to believe or not believe a witness.

It is clear that the jury chose to believe Reverend Andersen and his son. Their identification, rationally considered by the jury, could properly lead to the conclusion that beyond a reasonable doubt Harris was the person seen in the church.

*Was the defendant's alibi sufficient to*
*raise a reasonable doubt as to his guilt*

Shortly after arrest, the defendant filed a notice of alibi as required by sec. 955.07, Stats. In that original notice he claimed to have been at the home of his mother during the time the crime was perpetrated. Subsequent thereto, the court, for good cause shown, permitted the defendant to file another and separate notice of alibi, which claimed that at the time of the crime the defendant was in a parked automobile with a Gloria Borck Stingl. At the trial she testified that sometime near midnight on the night of December 26, 1965, she left her apartment in the company of the defendant and that they proceeded to the Carousel Bar, where they drank until closing time and thereafter parked in the defendant's automobile somewhere near Big Bend Road, Wisconsin, until approximately 3 a. m. The state made no effort to contradict Gloria Stingl's testimony, nor was there any evidence of record that would render her testimony inherently incredible.

The defendant takes the position that this alibi, corroborating the defendant's own testimony, was sufficient as a matter of law to raise a reasonable doubt of his guilt. A similar position was taken by the defendant in the case of *State v. Clarke* (1967), 36 Wis. 2d 263, 277, 153 N. W. 2d 61. In *Clarke* we recapitulated the cases holding that even an alibi corroborated and unimpeached

and not inherently incredible was merely additional evidence to be weighed by the jury and could be disregarded if not believed by the jury. In *Clarke,* we stated at page 277:

> "In *State v. Stevens, supra,* an alibi was presented as a defense and the court held the credibility of alibi witnesses and the weight accorded to their testimony is properly a function of the jury. In *State v. Grahn* (1963), 21 Wis. 2d 49, 52, 123 N. W. 2d 510, the court noted that testimony supporting an alibi does not raise a reasonable doubt as a matter of law.
>
> " ' "The defense of an *alibi,* if sufficiently established to raise a reasonable doubt in the minds of the jury, is a good defense. However, owing to the ease with which persons may be mistaken in dates long after the occurrence of a particular event, the ease with which an *alibi* may be made, and the difficulty of proving to the contrary, courts have not generally considered evidence of an *alibi* a conclusive defense. It is merely evidence to be weighed by the jury." *State ex rel. Dewey v. Kibbe* (1925), 186 Wis. 210, 212, 202 N. W. 333.'
>
> "Here though the alibi testimony was not inherently incredible, it was contradicted by two positive identifications of the defendant as the assailant and the jury was free to assign credibility to the identifying witnesses rather than to the alibi witnesses."

The instant case is similar in that the credibility of the alibi was placed in doubt by the eyewitness identification of Reverend Andersen and his son. The fact that the defendant had filed inconsistent alibis was known to the jury, and this fact might well have contributed to the jury's disbelief of Gloria Stingl. Under this state of facts, the jury was free to give credence to the testimony of the Andersens rather than to the defendant and his alibi witness.

*Did the state prove the required elements of sec. 943.10, Stats., that the entry must be "without the consent of the person in lawful possession" and "with intent to steal or commit a felony"*

The defendant vigorously argues that though it be shown that the defendant entered the office of Reverend Andersen, there was no proof as required by sec. 943.10, Stats., that such entry was "without the consent of the person in lawful possession." The testimony is completely to the contrary. Reverend Andersen testified that the office in question was used for his work and that he was the only person who had a key to it. In addition, he testified that no consent had been given to the defendant to enter his office. We see not even a tenuous basis for the argument of the defendant in this respect.

The state's proof of the element of intent to steal was sufficiently proved by the eyewitnesses who saw the defendant at the scene of the crime in possession of the stolen property. We have stated that a presumption of an intent to steal does not arise solely from the proof of breaking and entering. *State v. Kennedy* (1962), 15 Wis. 2d 600, 113 N. W. 2d 372; *State v. Reynolds* (1965), 28 Wis. 2d 350, 137 N. W. 2d 14. In *Galloway v. State* (1966), 32 Wis. 2d 414, 422, 145 N. W. 2d 761, 147 N. W. 2d 542, however, we pointed out that both *Kennedy* and *Reynolds* involved a public school building and stated:

". . . one who breaks and enters without consent into a private dwelling or a private office may more readily be found to have a felonious intent than one who breaks and enters into a public building."

In the instant case, the entry was into a private office. There was, in addition, the direct evidence of the Andersens that they saw the money from the ransacked office in the defendant's possession, and the defendant him-

self stated, when accosted in the church, "My wife is in the hospital and she needs money . . . . I'll give you the money I got . . . ." When he tossed the mission boxes toward the minister and his sons, he said, "Here is the money I have taken." We deem that entry with intent to steal is proved beyond a reasonable doubt.

*Did the state's failure to present scientific proof of the defendant's guilt render incredible other evidence identifying the defendant*

The defendant points out that no fingerprints were found at the scene of the crime. There, however, was testimony that the man at the scene was wearing gloves. Mention also is made of the fact that, although footprints were found in the vicinity of the window where the apparent entry to the church was made, no casts were made to preserve the exact shape and size of those footprints. The transcript, however, is replete with evidence that on the night in question there was a high wind and, although it was not snowing at the time, there was a considerable amount of snow on the ground and snow was drifting. Under these circumstances, a footprint cast, if one had been made, might well have been of doubtful probative value. The officer did, however, testify that the prints were made by a Cuban heel. That testimony was corroborative of the testimony of the two Andersens and also is circumstantially relevant, in view of the admitted fact that the defendant was wearing Cuban heels at the time of his apprehension. Defense counsel attempted to show that the defendant's stocking foot was larger than the dimensions of the footprints measured by the deputy sheriff. Under the weather conditions then prevailing, the jury could well have disregarded this proof and concluded that the measurements of the footprints under the drifting conditions were not accurate measurements of the size of the shoe

that made them. The officer characterized his diagram of the footprints as an approximate measurement.

*Should the defendant be granted a*
*new trial in the interest of justice*

The defendant's argument in this respect, although coupled with other "defects" alleged and discussed hereinbefore, hinges on the fact that the defendant was obliged to appear in a lineup for identification without counsel. He argues that although he recognizes that *Stovall v. Denno* (1967), 388 U. S. 293, 87 Sup. Ct. 1967, 18 L. Ed. 2d 1199, is applicable only to lineups conducted after June 12, 1967, since the procedure used in this case has subsequently been found to be constitutionally deficient, the verdict and conviction should be set aside in the interest of justice. We do not agree. While this court at the present time would not tolerate the lineup as conducted, it was constitutionally antiseptic as the rule was understood at that time. Moreover, as we have stated above, the identification was unequivocal and resulted in no injustice to the defendant. This court in *Lock v. State* (1966), 31 Wis. 2d 110, 142 N. W. 2d 183, discussed those rare situations in which it will use its discretionary power granted by sec. 251.09, Stats., to order a new trial in the interest of justice. We stated at page 118:

"In order for this court to exercise its discretionary power under sec. 251.09, Stats., it should clearly appear from the record that for some reason it is probable there has been a miscarriage of justice. In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."

We are satisfied that the defendant has been convicted on evidence that was clearly sufficient, and we see no

evidence that a retrial under the most optimum of circumstances contended for by the defendant would result in a different verdict. The conviction must be affirmed.

*By the Court.*—Judgment affirmed.